IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA M. HILL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 13-1604 |
| | ) | Judge Nora Barry Fischer |
| JAMES BARNACLE, *et al.*, | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

In this Section 1983 civil rights action, Plaintiff Donna Hill brings a First Amendment retaliation claim against Defendants Byron Brumbaugh, David Close, and Steven Glunt, who are Corrections Officials at SCI Houtzdale—where her husband was serving a life sentence before he was transferred to another state correctional institution. Hill alleges that Defendants suspended her visitation privileges in retaliation for engaging in a letter-writing campaign regarding her husband's mistreatment, filing a petition in state court, and her history of engaging in activities as a prisoners' rights advocate. The parties dispute whether Hill's constitutionally protected conduct was a substantial or motivating factor in the decisions to suspend her visitation privileges, and, if so, whether Defendants would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.

The United States Magistrate Judge issued a Report and Recommendation on August 26, 2020, recommending that Defendants' Motion for Summary Judgment be granted. (Docket No. 158). Presently before the Court are Plaintiff's Objections to the Report and Recommendation and Brief in Support (Docket Nos. 159; 161), Defendants' Response in Opposition (Docket No. 166),

and Plaintiff's Reply (Docket No. 168). After conducting a *de novo* review of the Report and Recommendation and having carefully considered all of the parties' submissions, this Court sustains Plaintiff's Objections and declines to adopt the Report and Recommendation. For the reasons more fully stated herein, the Court denies Defendants' Motion for Summary Judgment.

## II.   LEGAL STANDARD

The Federal Magistrate Judges Act governs the Court's review of a Report and Recommendation:

> When objections are filed to a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also United States v. Raddatz*, 447 U.S. 667, 674-75, 100 S. Ct. 2406, 65 L.Ed.2d 424 (1980) (explaining the standard for a district court's review of a magistrate judge's report and recommendation). The district court may accept, reject or modify—in whole or in part—the magistrate judge's findings or recommendations. § 636(b)(1)(C). Although the standard of review is de novo, § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 676, 100 S. Ct. 2406; *see also Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984) (noting the discretion district courts have in their use of magistrate judges' reports).

*Bonasorte v. City of Pittsburgh*, No. CV 18-0243, 2019 WL 1593720, at *1 (W.D. Pa. Apr. 15, 2019) (internal citation omitted).

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs. Inc.*, 44 F.3d 195, 200 (3d Cir. 1995)).

The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).[1] Under Fed. R. Civ. P. 56(e), either party that chooses to submit an affidavit in support of or in opposition to the motion for summary judgment must observe the following requirements: "The affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and

---

[1] The Court notes that Defendants in this case filed declarations, not affidavits. *See* DECLARATION, Black's Law Dictionary (11th ed. 2019) ("A formal, written statement— resembling an affidavit but not notarized or sworn to—that attests, under penalty of perjury, to facts known by the declarant. • Such a declaration, if properly prepared, is admissible in federal court with the same effect as an affidavit. 28 USCA § 1746.").

clearly demonstrate that the affiant is competent to testify to the matters identified in the affidavit." *Disilverio v. Serv. Master Prof'l*, No. CIV.A. 05-1368, 2007 WL 1029759, at *7 (W.D. Pa. Mar. 31, 2007). "Thus, Rule 56(e) limits the proper contents of an affidavit to facts, and the facts presented must be alleged on personal knowledge." *Id.*; Fed. R. Civ. P. 56(c)(4). In evaluating a summary judgment motion, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). However, the district court "may not make credibility determinations or weigh the evidence." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Finally, this Court "strictly applie[s]" Local Rule 56(C) and 56(E). *Polansky v. Vail Homes, Inc.*, No. CV 13-296, 2016 WL 2643253, at *4 (W.D. Pa. May 10, 2016) (citing *Janokowski v. Demand*, 2008 WL 1901347, at *1 (W.D. Pa. Apr. 25, 2008) (defendant's statement of material facts were deemed admitted for the purpose of summary judgment because of the plaintiff's violation of Local Rule 56.1(C)); *GNC Franchising LLC v. Kahn*, 2008 WL 612749, at *1 (W.D. Pa. Mar. 3, 2008) (the facts set forth in plaintiffs' statement of facts were deemed admitted by defendants due to defendants' violation of Local Rule 56.1(E)); *Ferace v. Hawley*, 2007 WL 2823477, at *1 (W.D. Pa. Sept. 26, 2007)). Under Local Rule 56(E), undisputed facts "will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." W.D. Pa. L.Cv.R. 56(E) (2013).

## III.   BACKGROUND
### A.   Factual History

Plaintiff Donna Hill is a longtime prisoners' rights advocate, serving on the boards of various advocacy groups and "work[ing] to expose wrongs by prison officials against those

persons serving time."[2] (Hill Decl., Docket No. 149-1 at 2-3). Hill's husband, Dwayne Hill, and daughter are both serving life sentences in the custody of the Pennsylvania Department of Corrections ("DOC"). (*Id.* at 3). Hill married her husband while he was in DOC custody, with the DOC's permission, in 2011. (*Id.*). Hill claims that she is well known by the DOC and its leadership because of her 30-plus year history of visiting inmates, organizing protests, writing letters to government officials, and generally criticizing the DOC for its treatment of prisoners—in addition to the fact that her communications with her husband are monitored, where she discusses these activities. (*Id*. at 3-4).

### 1.     The November 5, 2011 Letter

Hill's claims are based upon events alleged to have occurred while her husband was incarcerated at SCI Houtzdale in 2011 and 2012. At this time, Steven Glunt was the Superintendent at this facility, David Close was the Deputy Superintendent for Facilities Management, and Byron Brumbaugh was the Intelligence Captain.

In 2011, Hill learned that her husband had been sexually assaulted by a DOC officer at SCI Houtzdale and that the mental health unit was denying him necessary mental health treatment and medication. (*Id.* at 4). In response, Hill wrote letters to various news outlets, state lawmakers, and prison officials, including a letter dated November 5, 2011 to DOC Secretary John E. Wetzel. (*Id.*

---

[2] Plaintiff currently serves on the Board of Directors for Let's Get Free: the Women and Trans Prisoner Defense Committee. Let's Get Free educates and organizes around issues of prison injustice, addressing policies, contributing factors and collateral consequences of mass incarceration, as well as envisioning new systems of transformative justice and healing. She is also co-founding member of the Coalition to Abolish Death by Incarceration (CADBI – West), a member of the Human Rights Coalition, and served as president of Fight For Lifers West for 15 years. In addition, she has worked on sub-committees under former Pennsylvania State Senator Stewart Greenleaf and is active in other advocacy groups that work toward providing humane treatment for prisoners in Pennsylvania and beyond. She also previously served as a member of the Pennsylvania Prison Society. (Hill Decl., Docket No. 149-1 at 2-3).

at 4; Docket No. 149-4, hereinafter "the November 5 letter"). The November 5 letter reflects that copies were also sent to "Supt. Glunt, State lawmakers, news media and Dwayne Hill." (Docket No. 149-4). This letter expressed Hill's concerns about her husband's physical and mental health. Mr. Hill had been assigned to single-cell status (a.k.a. "Z-Code") throughout most of his twenty-year period of incarceration because of his claustrophobia, COPD, and, in Hill's opinion, PTSD.[3] (*Id.*). Now, SCI Houtzdale was trying to force him to move in with another inmate, who was a reported sex offender. (*Id.*). The November 5 letter requested an investigation as to why Hill's "husband was so abruptly no longer seen by a therapist, taken off the mental health tracking list and was forced to be placed into a cell with another prisoner, which terrified him." (*Id.*).

### 2.     The April 5, 2012 Incident

Five months later, on April 5, 2012, there was an incident between Mr. Hill and a corrections officer ("CO"). The nature of this incident is disputed. Defendants claim that Mr. Hill attacked a CO, without provocation, punching him in the head and face.[4] (Brumbaugh Report, Docket No. 138-1 at 15). Hill and her husband dispute that Mr. Hill ever assaulted the CO. (Dwayne Hill Decl., Docket No. 149-2 at 4). Rather, Hill asserts that when Mr. Hill was released from isolation, prison officials attempted to place him in a cell with a known violent offender, and Mr. Hill informed the CO that he feared for his life and could not be double-celled. (*Id.*). Instead of reporting these concerns, the CO became combative, began making orders and threats, and then attempted to push Mr. Hill into the cell. (*Id.*). When that was unsuccessful, the CO falsely accused Mr. Hill of assaulting him. (*Id.*).

---

[3] "A Z code is a single cell status for an inmate where they live in a cell all by themselves. They do not have a cell partner." (Brumbaugh Depo., Docket No. 138-2 at 45).

[4] Although Defendant Glunt referenced video evidence of the assault, it was never produced to the Court. (Glunt Depo., Docket No. 138-3 at 36).

On April 12, 2012, Hill went to visit her husband (for the first time since writing the November 5 letter) but was told that her visiting privileges were suspended and was directed to leave without further explanation. (Hill Decl., Docket No. 149-1 at 4). That same day, Hill called SCI Houtzdale and spoke to Defendant Brumbaugh, who had her come back inside to discuss her suspension. (*Id.* at 5). Defendant Brumbaugh and Hill continued to speak in the following weeks, during which Hill states that Brumbaugh questioned mail that she had sent and made threats towards her regarding her relationship with her husband. (*Id.*). Specifically, Hill states that Brumbaugh called her husband "a bad person, a monster, and threatened that [he] would never get out of solitary confinement" and that Brumbaugh threatened that he "would end my marriage." (*Id.*). Defendant Brumbaugh denies having made these remarks. (Brumbaugh Depo., Docket No. 138-2 at 79-80).

### 3.    The Brumbaugh Report

Defendant Brumbaugh was assigned to investigate the April 5 incident. The information and conclusions in his report (the "Brumbaugh Report" or "report"), dated April 11, 2012, are heavily disputed by the parties. With respect to the incident itself, the Brumbaugh Report concludes that Mr. Hill committed an unprovoked physical assault on CO Rightnour. (Brumbaugh Report, Docket No. 138-1 at 15). Specifically, the report states:

> Rightnour stated that as he was making a guard tour, [Mr.] Hill informed him that he wasn't going to do the "double cell" thing Rightnour responded by telling Hill that if he refused to enter the cell upon termination of block out, he would have to issue Hill a [misconduct]. Hill replied by saying, "Well, I'm not going in when block out is over." When Rightnour turned and walked away from Hill, Hill began punching Rightnour in his face and head with a closed fist. At this point, Rightnour tucked his head and attempted to "cover up" but Hill continued to strike him. As staff arrived, Hill stopped and stood in his doorway saying, ". . . come get some." As additional staff began to arrive, Hill entered his cell and the door was secured. Staff observed Hill inside of his cell pick up a Bic pen

7

> from the desk and state, "Come on . . . I wanna kill one of you."
> Eventually Hill agreed to be cuffed through the cell wicket and was
> escorted to the Restricted Housing Unit without further incident.

*Id.*

Based on a letter written by Hill to her husband and a telephone call between Hill and her husband, the Brumbaugh Report concludes that Hill had prior knowledge of her husband's intent to assault a CO and had actually encouraged him to commit this assault. (*Id.*; Brumbaugh Decl., Docket No. 138-1 at 36).

The report details that the letter, which was dated April 2, 2012 and addressed to Mr. Hill from an "Angel Jackson," stated: "I also think they don't want to mess with you about the Z Code until your time is up. If I was you, I know what I'd do, but I can't say. They would use it against me."[5] (*Id.* at 16). According to the report, during the telephone call that took place on April 5, 2012, Hill told her husband "to do what he needs to do and she supports him no matter what he does and its [sic] no big deal for her . . . ." (*Id.*). The report also concludes that Hill was using a different telephone number "as [to] not rouse suspension, [sic] and not to be monitored." (*Id.*).

Hill acknowledges that she wrote this April 2 letter to her husband, but that by "I know what I'd do," she was referring to her advocacy work and not encouraging violence. (Hill Decl., Docket No. 149-1 at 6-7). Hill denies making the statement attributed to her during the April 5 phone call. (*Id.* at 7). A transcript of the call confirms that Hill never made such a statement, but that Hill was using the alias "Angel Jackson." (Transcript of April 5 Call, Docket No. 149-6).

---

[5] Defendants failed to produce a copy of the April 2 letter. *See* Fed. R. Civ. P. 56(c)(1)(A) advisory committee notes ("Materials that are not yet in the record—including materials referred to in an affidavit or declaration—must be placed in the record.").

The Brumbaugh Report also references several previous incidents involving Hill that took place either at SCI Houtzdale or institutions where her husband was formerly incarcerated. These are: a previous suspension of Hill's visiting privileges for engaging in sexual acts; a previous suspension for supplying her husband with "contraband"; and a previous suspension for "disrespecting staff." (Brumbaugh Report, Docket No. 138-1 at 16). Hill claims that these past incidents are a misrepresentation of her record. (Hill Decl., Docket No. 149-1 at 7).

First, the report states that Hill had been suspended permanently in 2008 for introducing contraband—"implements of escape (maps)"—when Mr. Hill was housed at SCI Huntingdon, and that this suspension was lifted in 2010. (Brumbaugh Report, Docket No. 138-1 at 16). Hill clarifies that her visiting privileges were suspended after the DOC claimed that she supplied her husband with one aerial satellite photograph of SCI Huntington, but that she never provided her husband with such a photograph. (Hill Decl., Docket No. 149-1 at 7-8).

Regarding the sexual conduct suspension, in his deposition, Defendant Brumbaugh admitted that he does not know when Hill was suspended for "sexual acts" or of the circumstances underlying that suspension. (Brumbaugh Depo., Docket No. 138-2 at 71-72). Hill admits that her visiting privileges at SCI Forest were initially suspended on August 13, 2007, but after learning of her suspension, Hill asked the facility's superintendent, Raymond Sobina, to reinstate her privileges because she claimed that the grounds upon which the suspension was based were not true. (Hill Decl., Docket No. 149-1 at 7). In response, Mr. Sobina rescinded her suspension on September 4, 2007. (*Id*.; *see also* Sobina Letter, Docket No. 149-3).

Lastly, Defendants have since admitted that the DOC has never suspended Hill's visitation privileges for disrespecting staff. (Brumbaugh Depo., Docket No. 138-2 at 77-78).

### 4.    The Decisions to Suspend Hill's Visitation Privileges

Based upon this investigation and report, Defendant Brumbaugh recommended that Hill "be permanently suspended from visiting inmate Dwayne Hill, BQ5093." (Brumbaugh Report, Docket No. 138-1 at 17). Deputy Superintendent Close, who was filling in for Superintendent Glunt at the time, reviewed the report and made the decision to suspend Hill's visiting privileges at SCI Houtzdale indefinitely pending further investigation. (Close Decl., Docket No. 138-1 at 30-31). Hill was notified of Defendant Close's decision in a letter dated April 12, 2012, which did not provide an explanation for the suspension. (*See* Close Letter to Hill, Docket No. 138-1 at 7). Defendant Glunt's signature appears on this letter, even though it was signed by Defendant Close, a customary practice in the Superintendent's absence. (*Id*.; Close Decl., Docket No. 138-1 at 31). The matter was then referred to DOC's Office of Special Investigations and Intelligence ("OSII") for further investigation. (Close Decl., Docket No. 138-1 at 31).

On June 19, Hill filed a petition for a *writ of mandamus* in the Commonwealth Court of Pennsylvania (the "Commonwealth Court petition") seeking to enjoin the suspension of her visiting privileges and "direct[] Glunt to explain the basis for the suspension."[6] (Hill Decl., Docket No. 149-1 at 5; *see* Commonwealth Court Docket, Docket No. 138-1 at 19-2). Shortly thereafter, in a letter dated June 26, 2012, Defendant Glunt advised Hill that he made the decision to suspend her visiting privileges indefinitely. (Glunt June 26 Letter, Docket No 138-1 at 9). Glunt did not provide Hill with an explanation for the suspension. (*See id*.). Glunt has since stated that his

---

[6] The Pennsylvania Commonwealth Court ultimately dismissed Hill's petition on the merits. *See Hill v. Dep't of Corr.*, No. 419 M.D. 2012, 2013 WL 3970256, at *2 (Pa. Commw. Ct. 2013), *aff'd*, 80 A.3d 376 (Pa. 2013). "[A] court may take judicial notice of a prior judicial opinion and matters of public record." *United States v. Shumaker*, No. CR 09-87, 2011 WL 13176084, at *10 n.11 (W.D. Pa. Mar. 28, 2011), *aff'd*, 475 F. App'x 817 (3d Cir. 2012) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009)).

10

decision was based on the OSII investigation and the Brumbaugh Report. (Glunt Decl., Docket No. 138-1 at 25).

On July 17, 2012, Hill wrote to Defendant Glunt asking why her visiting privileges were suspended. (Hill Letter to Glunt, Docket No. 138-1 at 11). Glunt responded in a letter dated July 30, 2012, which read:

> [Y]our actions and support of your husband's behavior poses a threat to the safety and security of this facility. Serious staff injury resulted . . . . You have been suspended indefinitely on prior occasions and have been reinstated, only to return to behavior that poses a threat to the safety and security of the facility that houses your husband. The broad discretion shown by reinstating your visiting privilege has not yielded the expected positive results. As such, the suspension will continue.

(Glunt July 30 Letter, Docket No. 138-1 at 13).[7]

## B.    Procedural History

In November 2013, Hill initiated this action *pro se* by filing a Complaint alleging that Defendants retaliated against her by suspending her visiting privileges were suspended in retaliation for engaging in protected activity.[8] (*See* Docket No. 3). This case has a lengthy history, having been appealed to and vacated and remanded by the Third Circuit three times. *See Hill v. Barnacle*, 598 F. App'x 55 (3d Cir. 2015); *Hill v. Barnacle*, 655 F. App'x 142 (3d Cir. 2016); *Hill v. Barnacle*, 751 F. App'x 245 (3d Cir. 2018).

---

[7] The suspension of Hill's visiting privileges did not limit or bar visits with her daughter, who was in DOC custody at another state correctional institution. (Glunt July 30 Letter, Docket No. 138-1 at 13).

[8] Hill's Complaint was originally also against Defendants James Barnacle, Kenneth Hollibaugh, and Heath Moore, and included claims related to the interference with Hill's mail and suspension of her mail privileges. Hill has since indicated that she is no longer pursuing these claims (*see* Docket Nos. 147 at 5 n.1; 161 at 4 n.1), and on October 19, 2020, this Court granted Defendants' Motion for Summary Judgment, in part, as to all claims against Barnacle, Hollibaugh, and Moore and "claims related to the inference with her mail" and "suspension of her mail privileges," (Docket No. 163).

Upon the third remand, the Magistrate Judge appointed counsel and the parties engaged in discovery. Relevant here are Defendants' Motion for Summary Judgment and Brief in Support, Plaintiff's Response in Opposition, and Defendants' Reply Brief. (*See* Docket Nos. 135; 136; 147; 155). The United States Magistrate Judge then issued a Report and Recommendation, recommending that Defendants' Motion for Summary Judgment be granted. (Docket No. 158). Presently before the Court are Plaintiff's Objections to the Report and Recommendation and Brief in Support (Docket Nos. 159; 161), Defendants' Response in Opposition (Docket No. 166), and Plaintiff's Reply (Docket No. 168).

## IV.    ANALYSIS

In *Rauser v. Horn*, the Third Circuit set forth the elements of a prisoner's cause of action for retaliation and the burden of proof he must carry to succeed.[9] 241 F.3d 330, 333 (3d Cir. 2001). "In order to establish illegal retaliation for engaging in protected conduct, [Hill] must prove that: (1) [her] conduct was constitutionally protected; (2) [s]he suffered an adverse action at the hands of prison officials; and (3) [her] constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [her]." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser*, 241 F.3d at 333).

As to the third factor, "[b]ecause motivation is almost never subject to proof by direct evidence, [Hill] must rely on circumstantial evidence to prove a retaliatory motive." *Id.* She "can satisfy [her] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* (citing *Lauren W. ex rel. Jean W. v.*

---

[9] As the Third Circuit has previously noted, "Hill may maintain a retaliation claim against prison officials even though she is not a prisoner," and "[t]he standard applicable to non-prisoners is the same." *Hill v. Barnacle*, 655 F. App'x at 146 (internal citations omitted).

*DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "However, even if [Hill] establishes a *prima facie* case, prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Id*. (quoting *Rauser*, 241 F.3d at 334).

The Court first examines whether Hill has established a *prima facie* case of retaliation and then evaluates whether Defendants would have made the same decision despite Hill's protected activity. In this Court's estimation, for the reasons stated below, a genuine issue of material fact exists as to whether Hill's November 5 letter, her petition in the Pennsylvania Commonwealth Court, and her history of prisoner rights' advocacy were a substantial or motivating factor in Defendant Brumbaugh's recommendation, Close's initial suspension, and Glunt's ultimate indefinite suspension of her visitation privileges. This Court also concludes that the violations attributed to Hill that formed the basis of Defendants' decisions were not so "clear and overt" to allow the Court to conclude that there is no genuine issue of material fact as to whether Defendants would have made the same decisions absent her protected activity. *See id.* at 425-26.

### A.   *Prima Facie* Case of Retaliation

Defendants concede the first and second prongs of Hill's *prima facie* case of retaliation— that is, that Hill was engaged in protected conduct and suffered an adverse action. However, since this Court ultimately concludes that the evidence is sufficient to survive summary judgment, it first briefly explains why Hill has satisfied these first two prongs.

### 1.   Protected Activity

It is important to define the scope of Hill's protected activity, as the parties discuss this in different ways. Defendants concede that "the November 5, 2011 letter in which [Hill] expressed concerns to a number of people about the treatment her husband was receiving" and "the

mandamus action in Commonwealth Court" constitute constitutionally protected activity. (Docket No. 136 at 8). Hill argues that, in addition to those two specific instances, her protected activity includes her "history of letter writing campaigns and advocacy for prisoner rights." (Docket No. 161 at 8).

Whether an activity is protected is a question of law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). "The First Amendment's Petition Clause protects individuals from retaliation for filing non-sham lawsuits, grievances, and other petitions directed at the government or its officials." *Carey v. City of Wilkes-Barre*, No. CV 3:05-2093, 2008 WL 11492767, at *5 (M.D. Pa. Feb. 1, 2008), *report and recommendation adopted*, No. 05-CV-2093, 2008 WL 11492789 (M.D. Pa. Feb. 21, 2008) (citing *San Filippo v. Bongiovanni*, 30 F.3d 424, 439 (3d Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995)); *see also Hammonds v. Collins*, No. 12-CV-00236, 2016 WL 1621986, at *5 (M.D. Pa. Apr. 20, 2016) (filing lawsuits and grievances are protected activities under the First Amendment).

As such, the November 5 letter and the Commonwealth Court petition are plainly constitutionally protected activities. Admittedly, the record is limited regarding Hill's history of letter writing campaigns and advocacy for prisoner rights, that is, apart from general descriptions of the organizations for which Hill works. (*See* Hill Decl., Docket No 149 at 2-3 (discussing how, for the past thirty years in her role at various prisoner advocacy groups, Hill "continually work[ed] to expose wrongs by prison officials against those persons serving time," and "campaign[ed] for prisoner rights.")). To the extent that Hill's more general history involves filing grievances or petitions, it is also included in her protected activity.

### 2.      Adverse Action

Defendants also do not contest that Hill suffered an adverse action. (Docket No. 158 at 16). Indeed, the suspension of Hill's visitation privileges constitutes an adverse action, as it is "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (internal quotation marks and citation omitted); *see also Cooper v. Hoover*, No. CIV 1CV-06-0729, 2006 WL 3544711, at *2 (M.D. Pa. Dec. 8, 2006) (inmate alleging that he was punished by being denied visits from his daughter stated valid retaliation claim).

However, the parties appear to discuss only one adverse action—the final, indefinite suspension of her visitation. Rather, there are three adverse actions at issue: Defendant Brumbaugh's investigation and initial recommendation found in his report; Defendant Close's decision to suspend visitation pending a further investigation; and Defendant Glunt's indefinite suspension. Each action is "sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and Defendant Glunt could not have made his final decision without the first two actions. (*See* Glunt decl., Docket No. 138-1 at 25 ("Both the initial decision . . . and the final decision to suspend Plaintiff's visiting privileges . . . were based on the information learned through the previously identified investigations and reports.")).

### 3.      Causation as to Defendants Brumbaugh and Close

In her objections, Hill argues that a reasonable jury could conclude that Defendants Brumbaugh and Close were aware of Hill's protected activity—which includes both the November 5 letter and her history of letter writing campaigns and advocacy for prisoner rights—and that Defendants' actions were motivated by this protected activity because of:

- Hill's long history of prisoners' rights advocacy;

15

- Hill's frequent telephone and mail communications with her husband, which DOC officials monitored, and during which she openly discussed her advocacy;

- The carelessness and flawed nature of the investigation that relied upon purported instances of misconduct by Hill, which may be reasonably interpreted as mere pretext;

- The pattern of antagonism Defendant Brumbaugh exhibited against Hill in telephone calls before the investigation was completed;

- Defendants' repeated failure to provide a specific or honest explanation for Hill's indefinite suspension.

(Docket No. 168 at 2). Defendants argue that "Plaintiff has not presented any evidence that these two DOC officials were aware of the specific advocacy asserted to be the predicate of the instant retaliation claim." (Docket No. 166 at 5).

As noted earlier, Hill can establish causation with evidence of: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Watson*, 834 F.3d at 424. "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the [defendant's] articulated reasons . . . or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

The question before the Court is whether Hill has established a genuine issue of material fact as to whether her protected activity was a substantial or motivating factor in Defendant Brumbaugh and Defendant Close's actions. This is not the simple case where the plaintiff can point to an "unusually suggestive temporal proximity between the protected activity and the

16

allegedly retaliatory action." *See Rauser*, 241 F.3d at 334. Rather, the question here is if the record *as a whole* creates an inference of causation.

In this Court's estimation, there are simply too many disputed issues of material fact to grant summary judgment. At the outset, the Court notes that Defendants filed a Response to Plaintiff's Statement of Additional Material Facts Not in Dispute, in accordance with Local Rule 56(C) and (D); however, Defendants respond to many of Hill's additional facts merely by stating "[i]t is not disputed that Plaintiff so stated in her declaration." (*See* Docket No. 156). Under Local Rule 56(E), "[a]lleged material facts set forth in the . . . opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." W.D. Pa. L.Cv.R. 56(E) (2013). Defendants' indirect responses neither "specifically den[y] or otherwise controvert[]" Hill's declarations and, as those declarations clearly conflict with Defendants' declarations and deposition testimony, they underscore the questions of fact throughout the record.

Further, Defendants begin each of their declarations with "the following information is true and correct to the best of my personal knowledge *or information and belief*," and this qualifies the entirety of the information contained within them. (Docket No. 138-1 at 23, 29, 34) (emphasis added). "Rule 56(e) limits the proper contents of an affidavit to facts, and the facts presented must be alleged on personal knowledge. . . . Ultimate or conclusory facts . . . as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary judgment motion." *Disilverio*, 2007 WL 1029759, at *7; *see also Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, No. 20-3371, 2020 WL 7012522, at *5 (3d Cir. Nov. 27, 2020) ("'Upon information

and belief' is a lawyerly way of saying that [a party] does not know that something is a fact but just suspects it or has heard it.").

Bearing this in mind, and turning to whether Defendants Brumbaugh and Close were aware of Hill's protected activity, Defendants only claim that they "do not recall seeing" or were not "specifically aware" of the November 5 letter, and "consequently, [it] had no impact on [their] decision[s]."[10] (Brumbaugh Decl., Docket No. 138-1 at 37; Close Decl., Docket No. 138-1 at 32). Not only are these "credibility determinations," which would be improper for the Court to make on summary judgment, they are also improperly conclusory on a retaliation claim. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when she] is ruling on a motion for summary judgment."); *Hendricks v. Pittsburgh Pub. Schs.*, 2015 WL 540030, at *7 (W.D. Pa. Feb. 10, 2015) (citing cases) (failure to recollect creates a jury question); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) ("[T]he affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is ''essentially conclusory' and lacking in specific facts' is inadequate to satisfy the movant's burden.").

Furthermore, the above dispute, combined with the evidence of a pattern of antagonism from Defendant Brumbaugh (the threats he made in his phone calls to Hill) and the fact that his report contained both exaggerations and inaccuracies, on the whole, creates an inference of causation.[11] Specifically, during phone calls between Defendant Brumbaugh and Hill during the

---

[10] Defendants Brumbaugh and Close also state generally that they were "familiar with the Plaintiff," (see Brumbaugh Decl., Docket No. 138-1 at 35; Close Decl., Docket No. 138-1 at 29), and Brumbaugh stated that he "did not believe [he] was aware of" Hill's membership in prison advocacy groups (Brumbaugh Depo., Docket No. 138-2, at 25-26).

[11] The Report and Recommendation acknowledges that "there were inaccuracies in the [Brumbaugh] Report that were not adequately explained." (Docket No. 158 at 23).

initial investigation, Hill stated that Brumbaugh "called my husband a bad person, a monster, and threatened that my husband would never get out of solitary confinement . . . and said that he would end my marriage." (Hill Decl., Docket No. 149-1 at 5). Defendant Brumbaugh denies ever having made these statements. (Brumbaugh Depo., Docket No. 138-2 at 79-80).

Defendant Brumbaugh also relied on exaggerations and unsupported claims against Hill in his report that recommended an indefinite suspension of Hill's visiting privileges, which Defendant Close evaluated and used to form his decision. First, the report includes a reference to the April 5 telephone call wherein Hill allegedly tells Mr. Hill "to do what he needs to do and she supports him no matter what he does and its no big deal for her."[12] (Brumbaugh Report, Docket No. 138-1 at 16). However, Defendant Brumbaugh does not recall listening to this phone call and a transcript of the call reveals that Hill never made such a statement. (Brumbaugh Depo, Docket No. 138-2 at 50; Transcript of April 5 Call, Docket No. 149-6).

Next, the report refers to a letter from Hill to her husband in which she stated, "I also think they don't want to mess with you about the Z Code until your time is up . . . If I was you, I know what I'd do, but I can't say. They would use it against me." (Brumbaugh Report, Docket No. 138-1 at 16). According to the Brumbaugh Report, this meant Hill had knowledge of the impending assault and encouraged Mr. Hill to use violence. (*Id.*). But according to Hill, "I know what I'd do" consisted of her advocacy work—her protected activities. (Hill Decl., Docket No. 149-1 at 6). This is a disputed issue of material fact, and at the summary judgment stage, the inference must be drawn in Hill's favor.

___

[12] An "Automated Inmate Telephone System Record/Monitoring Log Book" form was also made part of the Court's record that shows that an officer listened to this call and also did not record the alleged statement from Hill. (*See* Docket No. 152). Defendants did not produce a declaration, affidavit, or testimony from this officer.

The Brumbaugh Report also states that Hill "has been suspended on numerous occasions for sexual acts, introducing contraband, and disrespecting staff."[13] (Brumbaugh Report, Docket No. 138-1 at 17). However, Defendants have since admitted that the DOC has never suspended Hill's visitation privileges for disrespecting staff. (Brumbaugh Depo., Docket No. 138-2, at 77-78). Hill also disputes the truth of the grounds upon which the sexual acts suspension was based, (Hill Decl., Docket No 149-1 at 7), and this suspension was rescinded immediately after Hill wrote the superintendent at SCI Forest contesting the same, (Sobina Letter, Docket No. 149-3). While Hill was suspended for providing her husband with one aerial satellite photo of the facility where he was then housed (the report states multiple "maps"), Hill continues to deny this allegation. (*See* Brumbaugh Report, Docket No. 138-1 at 16; Hill Decl., Docket No. 149-1 at 7-8). Hill even disputes that her husband attacked CO Rightnour, stating that this is a false accusation. (Dwayne Hill Decl., Docket No. 149-2 at 4). In fact, it appears that the only substantiated fact contained in the report was Hill's use of aliases to communicate with her husband, which is a violation of DOC rules. (*See* Transcript of April 5 Call, Docket No. 149-6 (call between Dwayne Hill and "Angel Jackson"); Glunt Decl., Docket No. 138-1 at 24). Lastly, Defendant Close did not give a reason for the initial suspension of Hill's visitation rights, contrary to DOC policy. (*See* Close Letter to Hill, Docket No. 138-1 at 7; DOC Policy DC-ADM 812, Inmate Visiting Privileges, https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/812%20Inmate%20Visiting%20Privileges.pdf (last visited December 21, 2020)).

---

[13] In answering questions about his report, Defendant Brumbaugh often does not know where he got the information contained within it. (Brumbaugh Depo., Docket No. 138-2, at 69-70, 71-72, 77-78 (Q: "How did you become aware of [the contraband] incident?" A: "I don't recall."; Q: "Do you know anything about the circumstances underlying [the sexual acts] suspension?" A: "No"; Q: "Do you know where you substantiated [the disrespecting staff suspension]?" A: "No.").

This is not as clear cut a case as *Watson*, where only a few hours had elapsed between the plaintiff's protected activity and the adverse action. *See Watson*, 834 F.3d at 424. Indeed, Brumbaugh's investigation and recommendation and Close's initial suspension occurred five months after Hill's November 5 letter. But the timing, pattern of antagonism, and circumstantial evidence here—nearly all of which the parties dispute—is enough to conclude that the record as a whole supports the inference of causation as to Defendants Brumbaugh and Close. *Farrell*, 206 F.3d at 280–81 (holding that "timing plus other evidence may be an appropriate test where the temporal proximity is not so close as to be 'unduly suggestive'" and "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference"). In addition, though Defendants challenge causation by arguing that too long a time had passed between the November 5 letter and the decisions to suspend visitation in April and June, and therefore they could not have relied on the letter, this argument is undermined by the fact that they do rely on disputed events that pre-date the letter in the Brumbaugh Report to support their decision to suspend visitation.

Taken as a whole, a reasonable jury could find that Hill's protected activities were known to Defendants and that the investigation and findings were motivated based upon Plaintiff's protected activity. Because this is a ruling on summary judgment where the evidence must be viewed in the light most favorable to the non-moving party, this Court finds that there is a genuine issue of fact as to whether the record as a whole establishes causation between Hill's protected activity and Defendant Brumbaugh's recommendation and Defendant Close's initial suspension of visitation privileges. *See Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005) (noting "that the first prong of the First Amendment retaliation test presents questions of law for the court while

the second and third prongs present questions of fact for the jury," as long as those questions of fact are genuine).

### 4. Causation as to Defendant Glunt

While "it is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct," *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002), "[p]roof of knowledge can come from direct or circumstantial evidence." *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon*, 503 F.3d at 232. "[S]uch an inference [can] be drawn where two days passed between the protected activity and the alleged retaliation . . . but not where 19 months had elapsed." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

In this Court's estimation, a reasonable jury could conclude that Glunt had knowledge of both the November 5 letter and the Commonwealth Court petition and that they were a substantial or motivating factor in the decision to suspend her visitation privileges. As to the November 5 letter, while Glunt stated that he "do[es] not recall receiving that letter," he admitted that the letter reflects that a copy was sent to him. (Glunt Depo., Docket No. 138-3 at 27-28). Defendants further admit in their responses to Plaintiff's Requests for Admissions that "Defendant Glunt did review this letter and did note that a copy had been sent to him; however, he did not have any specific recollection of this letter."   (*See* Docket No. 157-1 at 5); *Hendricks*, 2015 WL 540030, at *7 (failure to recollect creates a jury question).

Defendant Glunt also denies knowledge that the Commonwealth Court petition was filed, though he admits being familiar with Hill and consulting with OSII in order to further investigate her. (Glunt Decl., Docket No. 138-1 at 25-26). Given this, and given that the purpose of the petition was to "seek[] an order directing Glunt to explain the basis for the suspension," a reasonable jury could conclude that Glunt knew of the Commonwealth Court petition. (Hill Decl., Docket No. 149-1 at 5). Further, the Commonwealth Court docket reflects that preliminary objections were filed on July 16, which was about two weeks before Glunt responded to Hill's letter requesting an explanation for why her visitation was suspended. (*See* Docket No. 138-1 at 13; 20).

Finally, because less than a week passed between when Hill filed her petition in the Pennsylvania Commonwealth Court on June 20, 2012 and Glunt's June 26, 2012 letter announcing that the investigation was complete and Hill's visiting privileges would be suspended indefinitely, there is an "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." *See, e.g.*, *Hyman v. Giorla*, No. 10-499, 2014 WL 881137, at *3 (E.D. Pa. Mar. 5, 2014) ("Ordinarily, a period of less than one week is unusually suggestive."); (Glunt June 26 Letter, Docket No. 138-1 at 9; Commonwealth Court Docket, Docket No. 138-1 at 19). Glunt's June 26 letter also did not provide an explanation for why Hill's visiting privileges were being suspended, and DOC Policy states that "[i]f the Facility Manager suspends a visitor's visiting privileges for any reason, that Facility Manager shall notify the visitor of the reasons for the suspension." (*See* DOC Policy DC-ADM 812, Inmate Visiting Privileges, https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/812%20Inmate%20Visiting

%20Privileges.pdf (last visited December 21, 2020)).[14] For these reasons, and those already discussed in the prior section, Hill has demonstrated a triable issue of fact as to causation.

\* \* \*

In conclusion, there is a genuine issue of material fact as to whether Hill's November 5 letter, her Commonwealth Court petition, and her history of prisoner rights' advocacy were a substantial or motivating factor in Defendant Brumbaugh's recommendation, Close's initial suspension, and Glunt's ultimate indefinite suspension of her visitation privileges.

Therefore, Hill has established a *prima facie* case of retaliation and the burden shifts to Defendants to prove that they would have made the same decision absent the protected conduct for reasons reasonably related to legitimate penological interests.

### B.    The "Same Decision Defense"

Even if Hill establishes a *prima facie* case of retaliation, Defendants may still prevail with the "same decision defense"—that is, if they prove that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. This Court is mindful of the "great deference [afforded to prison officials] in the context of prison disciplinary proceedings." *Harris v. Giroux*, No. 1:16-CV-0038, 2019 WL

---

[14] The effective date on this DOC Policy is September 27, 2018. Though a copy of the policy was not made part of the Court's record, Defendant Glunt referenced this policy in his July 30 letter to Hill, which answered Hill's request for a reason for her suspension. (*See* Glunt July 30 Letter, Docket No. 138-1 at 13 ("As previously indicated, your actions and support of your husband's behavior poses a threat to the safety and security of this facility. Serious staff injury resulted. In accordance with DC-ADM 812, Section 1.B.8., your visiting privileges have been suspended indefinitely. You may view this policy on our public website at www.cor.state.pa.us.")). The Court can also take judicial notice of the policy, as it is a public document, "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See Shumaker*, 2011 WL 13176084, at \*10 n.11 (quoting Fed. R. Evid. 201(b)).

330459, at *10 (W.D. Pa. Jan. 25, 2019) (quoting *Watson*, 834 F.3d at 426). "Prison officials are entitled to summary judgment for disciplining a prisoner, even if their actions were motivated by animus, as long as the prisoner's offenses 'were so clear and overt' such that there was no genuine issue of material fact that the officials' actions were reasonably related to legitimate penological interests." *Id*. at *10 (citing *Carter v. McGrady*, 292 F.3d 152, 154 (3d Cir. 2002)).

For instance, in *Harris v. Giroux*, the Court held that "[w]here an inmate has been found guilty of the charges in a purportedly retaliatory misconduct report after a disciplinary hearing has taken place, the finding of guilt is considered strong evidence that the misconduct report was issued for a legitimate penological reason." 2019 WL 330459 at *10 (internal citations omitted). This, plus "a meaningful written statement of the evidence relied on and the reasons for the action taken, establishe[d] a quantum of evidence of misconduct sufficient to warrant summary judgment." *Id*. (internal quotation marks and citations omitted). In *Harris*, however, the quantum of record evidence was insufficient because the facts surrounding plaintiff's misconduct charge were disputed, and though the hearing examiner found plaintiff guilty of the misconduct, the defendant's version of events was not supported by evidence or testimony from other COs or video footage. *Id*. at *11-12.

Similarly, in this Court's estimation, the "quantum of record evidence" pertaining to Hill's violations is insufficient, thereby raising a genuine issue of material fact as to whether the suspension of her visiting privileges was premised on a legitimate penological issue. As previously discussed, Hill contests that her husband committed an unprovoked assault on a CO and that she encouraged him to do so in the April 2 letter or April 5 telephone call with her husband. Given these disputed facts, the Court cannot accept the "same decision defense" advanced here and grant summary judgment on this basis.

Indeed, the only substantiated violation contained in the Brumbaugh Report was Hill's use of aliases to communicate with her husband, but Defendants do not argue that this violation alone would support the permanent ban on her visitation privileges. (*See* Transcript of April 5 Call, Docket No. 149-6). The remaining violations that form the basis of Defendants' decisions to recommend and suspend Hill's visitation privileges are in dispute, including: the meaning of "I know what I'd do" in Hill's letter; the basis for the sexual conduct suspension; and, the basis for the map suspension.[15] Further, Defendants admit that the DOC has never suspended Hill's visitation privileges for "disrespecting staff," and the transcript of the April 5 call does not include a statement by Hill to her husband to "do what he needs to do." (Brumbaugh Depo., Docket No. 138-2, at 77-78; Transcript of April 5 Call, Docket No. 149-6).

In sum, viewing the evidence in the light most favorable to Hill, her alleged violations were not so "clear and overt" as to allow the Court to conclude that there is no genuine issue of material fact as to whether Defendants would have made the same decisions absent her protected activity.

## V.   CONCLUSION

Based on the foregoing, the Court sustains Plaintiff's Objections, declines to adopt the Report and Recommendation [158], and Defendants' Motion for Summary Judgment [135] is denied. An appropriate Order follows.

> *s/Nora Barry Fischer*
> Nora Barry Fischer
> U.S. District Judge

Dated: December 21, 2020

---

[15] The Pennsylvania Department of Corrections website states that "[t]here will be an indefinite ban for any visitor caught introducing contraband into visit rooms." *See* https://www.cor.pa.gov/family-and-friends/Pages/Visiting-Rules.aspx (last visited December 21, 2020). However, it is unclear if this was the policy in effect at the time of the asserted violation. *See also Shumaker*, 2011 WL 13176084, at *10 n.11 ("a court may take judicial notice of . . . matters of public record").

cc/ecf:  All counsel of record.